115 T.C. No. 17


UNITED STATES TAX COURT


MICROSOFT CORPORATION, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 16878-96.                    Filed September 15, 2000.


During 1990 and 1991, petitioner engaged its wholly owned subsidiary, a foreign sales corporation, to act as its agent for the international sales of standardized mass-marketed computer software products and computer software masters. The standardized software products were copyrighted articles sold without a right to reproduce abroad. The software masters were licensed to related foreign subsidiaries and unrelated foreign equipment manufacturers with a right to reproduce abroad.

In the notices of deficiency, respondent allowed the deductions for the foreign sales corporation commissions attributable to the standardized software products but denied them with respect to the export of the software masters. The issue is whether the software masters

constitute "export property" within the meaning of sec. 927(a), I.R.C., and sec. 1.927(a)-1T(f)(3), Temporary Income Tax Regs., 52 Fed. Reg. 6463 (Mar. 3, 1987) (the temporary regulation).

Held: The temporary regulation is a reasonable and valid interpretation of sec. 927(a)(2)(B), I.R.C.

Held, further, computer software masters do not constitute sec. 927(a), I.R.C., "export property".

James M. O'Brien, Michael P. Boyle, John M. Peterson, Jr., Thomas V.M. Linguanti, Andrew J. Gottlieb, Neal J. Block, Scott H. Frewing, Robert B. Mitchell, Michael J. Bernard, and William H. Burkhart, for petitioner.

David P. Fuller, John M. Altman, Ronald M. Rosen, Kimberley J. Peterson, Michelle D. Korbas, and Kevin G. Croke, for respondent.

JACOBS, Judge: Pursuant to two notices of deficiency addressed to petitioner, respondent determined Federal income tax deficiencies and an overpayment, as follows:

| Tax Year Ended June 30 | Deficiency | Overpayment |
|---|---|---|
| 1987 | $6,279,330 | --- |
| 1988 | 4,618,862 | --- |
| 1989 | 1,644,505 | --- |
| 1990 | --- | $1,944,520 |
| 1991 | 8,810,992 | --- |

The deficiencies determined for 1987-89 are attributable to respondent's adjustments to general business credit carrybacks from

1990 and 1991 to 1987-89 and to foreign tax credit carrybacks from 1990 to 1987 and 1988. These adjustments are computational, arising from income adjustments for 1990 and 1991.

## Introduction

Petitioner develops, produces, and markets computer software. During 1990 and 1991, petitioner engaged its wholly owned subsidiary, Microsoft FSC Corp. (MS-FSC), to act as its agent for the international sales of standardized mass-marketed computer products and computer software masters.[1] These products were sold/licensed to petitioner's controlled foreign corporations (CFC's) and unrelated foreign original equipment manufacturers (foreign OEM's).

---

[1] Pursuant to the foreign sales corporation provisions (secs. 921 through 927), a domestic corporation may receive favorable tax treatment on a portion of its profits from international sales of its U.S.-made products by selling/leasing such products through a foreign corporate subsidiary (the foreign sales corporation). Specifically,

(1) That portion of the foreign sales corporation's income (known as exempt foreign trade income) is not subject to U.S. taxation in the hands of the foreign sales corporation;

(2) the domestic corporation may deduct the commission paid to the foreign sales corporation based upon the amount the foreign sales corporation reports as foreign trade gross receipts (using certain administrative pricing rules); and

(3) the domestic corporation can exclude dividend distributions from its foreign subsidiary (e.g., the foreign sales corporation) that are attributable to the foreign sales corporation's exempt foreign trade income.

Pursuant to the licensing agreements with the CFC's, petitioner earned a royalty based upon a percentage of the CFC's revenues from the sale of the licensed software products. Pursuant to the licensing agreements with the foreign OEM's, petitioner earned a royalty equal to the greater of the OEM's computer systems sales or copies of the computer software products distributed.

MS-FSC reported the royalties as foreign trading gross receipts (FTGR's). Petitioner paid MS-FSC a commission (based upon the amount MS-FSC reported as FTGR's) and deducted the foreign sales corporation (FSC) commission, using the applicable administrative pricing rules.

It is the aforementioned royalties and FSC commissions that are at issue, namely:

|  | 1990 | 1991 |
|---|---|---|
| Royalties--foreign OEM's | $155,784,783 | $150,349,955 |
| FSC commissions per return | 11,477,502 | 5,019,782 |
| Royalties--CFC's | 55,817,274 | 112,887,716 |
| FSC commissions per return | 4,948,544 | 10,321,015 |
| Additional Irish royalties | 12,669,936 | 16,816,754 |
| Additional FSC commissions per petition | 2,914,085 | 3,867,853 |

Respondent determined that the disputed royalties were nonqualifying FTGR's. As a result, respondent disallowed FSC commission deductions of $16,426,046 for 1990 (i.e., $11,477,502 + $4,948,544) and $15,340,797 for 1991 (i.e., $5,019,782 +

$10,321,015), which petitioner claimed in connection with its computer software masters exported for reproduction and distribution abroad.

Petitioner also claimed FSC commission deductions of $4,049,134 for 1990 and $13,625,222 for 1991 with respect to its export sales of standardized software products. Respondent has allowed these deductions.

The dispositive issue to be resolved is whether the royalties attributable to the licensees' reproduction and distribution of petitioner's computer software masters outside the United States constitute FTGR's within the purview of section 924. Resolution of this issue hinges upon whether the licensed computer software masters constitute "export property" within the meaning of section 927(a)(1) and the temporary regulations thereunder.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulations of facts and the attached exhibits are incorporated herein by this reference.

A. Background

Petitioner, a Washington corporation, maintained its principal place of business in Redmond, Washington, at the time the petition

was filed. It was the common parent of an affiliated group of corporations, which filed consolidated Forms 1120, U.S. Corporation Income Tax Return, for 1987, 1988, 1989, 1990, and 1991.

During the years in issue, petitioner conducted its business through several operating groups: Systems software, applications software, systems peripherals and accessories group, OEM sales, U.S. sales and marketing, international operations, and press.

Approximately three-quarters of petitioner's worldwide employees were based in Redmond, where petitioner developed its products.

B. MS-FSC

MS-FSC was organized as a Virgin Islands corporation on December 24, 1984. On January 1, 1985, petitioner and MS-FSC entered into a Commission and Expense Agreement, which remained in effect during the years in issue. At all relevant times, MS-FSC elected to be taxed as a foreign sales corporation and was so qualified. MS-FSC determined its commission income using section 925(a) administrative pricing rules.

C. Petitioner's Products

Petitioner's first products were programming languages and tools that permitted software developers to create computer software. Thereafter, petitioner's product line was expanded to include operating systems. In 1981, petitioner released its first operating system, "Microsoft Disk Operating System" or "MS-DOS",

for International Business Machine's (IBM's) first microcomputer. MS-DOS was the operating system used on a majority of IBM's personal computers and IBM-compatible personal computers. Petitioner (MS-DOS), IBM (PC-DOS or IBM-DOS), Digital Research (DR-DOS), and other companies marketed a disk operating system (DOS) under various names. DOS was a text or character-based system; it required computer users to input words or characters to give the computer commands. Since 1981, operating systems software has continually evolved to permit computer users to accomplish increasingly diverse and complex tasks on computers.

In addition to MS-DOS, petitioner marketed other proprietary operating systems during the years at issue, such as "Microsoft Windows", "Microsoft LAN Manager", and "XENIX". At that time, MS-DOS accounted for the largest number of Microsoft operating system units distributed; Microsoft Windows was second.

In the early 1980's, petitioner also began to develop and market application software products in order to increase the appeal of the microcomputer. Petitioner's applications included word processing (e.g., "Microsoft Word"), spreadsheet computations (e.g., "Microsoft Excel"), graphics (e.g., "Microsoft PowerPoint"), and video games (e.g., "Microsoft Flight Simulator"). In 1990 and 1991, petitioner offered a wide line of application software products.

Petitioner created its software products at its Redmond facilities. It took 25 to several hundred persons to develop a computer software product (i.e., Microsoft Windows or Microsoft Excel).

Petitioner's product development, which could take up to 3 years, involved three phases: (1) Product planning, during which a functional specification and final schedule were prepared (3-12 months); (2) product development, during which the source code was completed (and was further revised in the next phase) (6-12 months); and (3) product stabilization, during which a gold master was produced and the software product was released for duplication (3-8 months).

D. Production of Masters for Export

From an American-made gold master, petitioner's product release services group (PRS) in Redmond produced master copies of the software and related documentation for distribution to petitioner's Canyon Park facility, the foreign OEM's, and the CFC's. These masters contained object code for computer programs and related data files. Petitioner's PRS duplicated the masters on various media, depending upon the size of the particular software product and the distribution channel.

Petitioner's products used magnetic tape for masters provided to the foreign OEM's. Specifically, during the years in issue, PRS provided masters to the foreign OEM's on .25-inch magnetic tapes,

5.25-inch diskettes, and 3.5-inch diskettes.

The software masters remained petitioner's property and were unavailable for distribution to third parties. After petitioner provided the foreign OEM or CFC with a software master, the licensee stored the information on a network computer and archived the master for security or production purposes. Upon transfer to the network, the licensee's duplication equipment accessed the digital information to initiate duplication runs.

E.  Petitioner's Export Transactions

Petitioner distributed its computer software products worldwide. In connection with its sales abroad, petitioner used two types of channels: (1) The foreign OEM channel, and (2) the international retail channel. The products distributed through these channels were duplicated both in the United States and abroad. Petitioner's international revenues (from both the foreign OEM and retail channels) constituted 54.9 percent of petitioner's total revenues for 1990 and 57.3 percent for 1991.

F.  Foreign OEM Channel

Petitioner's foreign OEM channel consisted of computer manufacturers that installed petitioner's software directly into the hard drive of a computer and/or "bundled" software-encoded media along with the computer. The foreign OEM's distributed petitioner's computer software as a component of their own computer systems.

In 1990 and 1991, approximately 500 foreign OEM's distributed petitioner's software products. Operating systems constituted the bulk of these products.

During these years, approximately 250 foreign OEM's paid royalties to petitioner pursuant to the OEM agreements. The top 10 products licensed to the foreign OEM's (ranked in terms of royalties petitioner accrued) were as follows:

|  | 1990 | | 1991 | |
| --- | --- | --- | --- | --- |
| Product | Units | Revenue | Units | Revenue |
| MS-DOS | 7,079,682 | $96,742,734 | 7,726,513 | $116,463,986 |
| GW-Basic Interpreter | 941,064 | 6,882,172 | 762,623 | 12,535,546 |
| Windows | 760,961 | 5,779,208 | 1,686,907 | 4,378,615 |
| Windows 386 | 226,552 | 4,114,398 | 38,580 | 4,227,137 |
| OS/2 | 22,128 | 2,784,467 | 151,267 | 2,790,240 |
| Shell/DOS | 929,728 | 2,359,430 | 188,846 | 2,759,226 |
| MS-Works | 154,732 | 2,054,785 | 364,822 | 2,733,731 |
| LAN Manager | 2,942 | 1,612,589 | 4,299 | 1,828,122 |
| Networks | 86,562 | 1,083,822 | 171,035 | 1,534,083 |
| Basic Interpreter | 176,279 | 994,132 | 60,154 | 1,427,047 |

These products represented approximately 75 percent of petitioner's foreign OEM licensing revenues for 1990 and approximately 84 percent for 1991.

During 1990 and 1991, petitioner also licensed applications and other software products to the foreign OEM's.

G. Standard OEM License Agreement

Petitioner's OEM business personnel and legal staff drafted a standard (exemplar) OEM license agreement (the standard OEM agreement) as the basis for negotiating licenses with the foreign OEM's. The standard OEM agreement was the starting point from which negotiations ensued.

Whether a foreign OEM and petitioner entered into a license agreement or a distribution agreement depended upon several factors, such as the foreign OEM's projected volume of computer sales, the size of the market for a particular software product, and petitioner's confidence in the foreign OEM's trustworthiness and recordkeeping. Pertinent provisions of the standard OEM agreement include the following provisions:

2. LICENSE GRANT

(a) MS [Microsoft] grants to COMPANY [licensee] the following nonexclusive, worldwide license rights:

(i) to adapt the Product as necessary to enable it to execute on COMPANY's Customer System(s);

(ii) to reproduce and manufacture the Product in object code form; and

(iii) to distribute directly or indirectly and license the Product in object code form to end users, under the terms of COMPANY's end user license agreement.

All rights not expressly granted, including without limitation translation rights, are reserved by MS.

* * * * * * *

7. COPYRIGHT NOTICES; TRADEMARKS

(a) COMPANY will cause to appear on the container and labels of each copy of Product, the copyright and patent notices for the Product that appear on the applicable release of the Product as provided to COMPANY pursuant to Section 2 hereof * * *

(b) COMPANY shall market the Product only under the Product name(s) for such Product as specified * * * and COMPANY agrees to use the appropriate trademark symbol * * * and clearly indicate MS' ownership of its

trademark(s) whenever the Product name is first mentioned in any advertisement, brochure or in any other manner in connection with the Product. COMPANY's name and/or trademarks shall not be displayed in relation to the Product name in a manner which suggests that COMPANY's name and/or trademarks are part of the Product name. COMPANY agrees to maintain the high level of quality accorded products associated with and marketed by MS under MS' trademarks. COMPANY shall not use or display any MS logo in its materials or packaging without MS' prior written permission. COMPANY shall not use or imitate the trade dress of MS products. COMPANY's name and/or trademarks shall be displayed on the packaging and disk labels for the Product at least as prominently as the name "Microsoft." Upon request, COMPANY shall submit the Product in proposed finished goods form (including software and documentation) to MS for approval prior to distribution, which approval shall not be unreasonably withheld. COMPANY shall, upon request, provide MS samples of all COMPANY literature which uses Product name(s). COMPANY shall provide MS with five (5) copies of the Product in finished goods form.

\*     \*     \*     \*     \*     \*     \*

13. NONDISCLOSURE AGREEMENT

COMPANY expressly undertakes to retain in confidence and to require its distributors to retain in confidence all information and know how transmitted to COMPANY by MS that MS has identified as being proprietary and/or confidential or that, by the nature of the circumstances surrounding the disclosure, ought in good faith to be treated as proprietary and/or confidential, and will make no use of such information and know-how except under the terms and during the existence of this Agreement. However, COMPANY shall have no obligation to maintain the confidentiality of information that (i) it received rightfully from another party prior to its receipt from MS; (ii) MS has disclosed to a third party without any obligation to maintain such information in confidence; or (iii) is independently developed by COMPANY. Further, COMPANY may disclose confidential information as required by governmental or judicial order, provided COMPANY gives MS prompt notice of such order and complies with any protective order (or equivalent) imposed on such disclosure. COMPANY shall treat all Product adaptation materials (including source code) as confidential

- 13 -

information and shall not disclose, disseminate or distribute such materials to any third party without MS' prior written permission. COMPANY shall treat the terms and conditions of this Agreement as confidential; however, COMPANY may disclose such information in confidence to its immediate legal and financial consultants as required in the ordinary course of COMPANY's business. COMPANY'S obligation under this Section 13 shall extend to the earlier of such time as the information protected hereby is in the public domain through no fault of COMPANY or ten (10) years following termination or expiration of this Agreement.

\*       \*       \*       \*       \*       \*       \*

16. CONTROLLING LAW; NO FRANCHISE

(a) This Agreement shall be construed and controlled by the laws of the State of Washington, and COMPANY consents to jurisdiction and venue in the state and federal courts sitting in the State of Washington. * * *

\*       \*       \*       \*       \*       \*       \*

18. GENERAL

\*       \*       \*       \*       \*       \*       \*

(f) The Section headings used in this Agreement and the attached Exhibits are intended for convenience only and shall not be deemed to supersede or modify any provisions.

The OEM agreements granted the licensee the right to modify, reproduce, and distribute the licensed software (and derivative work) on or with the foreign OEM's hardware systems specified in each agreement. The royalties at issue were paid as consideration pursuant to these agreements, which computed the royalty on a "per copy" or "per system" basis. The foreign OEM's paid a royalty for each copy of the copyrighted work duplicated and distributed in the

market, or for each computer system manufactured and sold by the foreign OEM's.

The OEM agreements required the foreign OEM's to make minimum commitment payments quarterly. To the extent earned royalties exceeded the cumulative minimum commitment payments, the foreign OEM's were required to pay petitioner for actual earned royalties. To the extent cumulative minimum commitment payments exceeded actual earned royalties, the excess was considered prepaid royalties and was recoupable against future earned royalties during the term of the license agreement.

The standard OEM agreement was for a 2-year term. The foreign OEM's generally extended their relationship with petitioner by entering into subsequent agreements licensing later releases and versions of the same software.

The proprietary information petitioner transferred to the foreign OEM's (pursuant to the standard OEM agreement) was maintained as a trade secret. The parties have stipulated that this proprietary information included algorithms, processes, formulas, and designs.

The foreign OEM's could also license petitioner's source code for specific products pursuant to a separate, royalty-bearing license arrangement (source code license). A source code license authorized the foreign OEM to use the source code solely for

"internal use" in furtherance of its license to adapt, reproduce, and distribute the computer software in object code form. Pertinent provisions of the source code license are as follows:

> 19. <u>LICENSE GRANT FOR SOURCE CODE</u>
>
> (a) MS grants to COMPANY a nonexclusive, personal, nontransferable, nonassignable license during the term of the Agreement to use and modify the source codes of the Products ("Source Code") * * *
>
> (b) The license granted hereunder shall extend to the Source Code for any new releases to each Product as are supplied by MS and accepted by COMPANY. * * *
>
> (c) COMPANY hereby conveys to MS all right, title and interest to any modifications made to the Source Code by COMPANY. MS grants to COMPANY non-exclusive marketing and distribution rights to the object code version of any modifications made to the Source Code by COMPANY * * *
>
> (d) Notwithstanding anything to the contrary contained herein, COMPANY shall not reproduce, duplicate, copy or otherwise disclose, distribute or disseminate Source Code (code or listing) in any media except for COMPANY's own internal use by COMPANY'S full-time employees on a need-to-know basis on COMPANY premises. * * *

The foreign OEM's paid royalties for the source code in addition to other royalty payments.

In some instances, petitioner provided a foreign OEM with an OEM adaptation kit (OAK), which contained a copy of the product's object code, sample adaptation code, and related documentation. An OAK assisted foreign OEM's to adapt operating systems to personal computers. Whether a foreign OEM needed the adaptation code depended on its particular computers.

H.  International Retail Channel

In 1990 and 1991, petitioner exported shrink-wrapped software[2] products (made in the United States) to its CFC's for distribution to end users outside the United States.  In addition, petitioner licensed its CFC's the rights to duplicate and distribute shrink-wrapped software packages outside the United States pursuant to CFC (or product localization) agreements.  In most instances, the CFC's localized petitioner's software and then manufactured copies of the localized software for distribution as shrink-wrapped products.

The CFC's in Ireland (Microsoft Ireland), Japan (Microsoft Japan), Korea (Microsoft Korea), and Taiwan (Microsoft Taiwan) reproduced, packaged, and distributed retail products for the international retail channel, as well as white box products for the international OEM channel.  (A "retail" product consisted of an individual copy of the software marketed in a decorative retail box (shrink-wrapped software), containing software-loaded storage media, user manuals, and other documentation.  A "white box" product consisted of software-loaded media and product documentation packaged in a plain white box, intended to deter separate retail sales by a foreign OEM.)  Microsoft Ireland manufactured both retail

_____

[2]     Shrink-wrap packaging consisted of packing the software-loaded diskettes with manuals and other printed materials in shrink-wrapped boxes bearing graphics, product information, trademark registrations, trade names, and other trade dress.  The warehousing operation consisted of storing and shipping the shrink-wrapped software packages.

and white box products from masters petitioner supplied.  Microsoft Japan, Microsoft Taiwan, and Microsoft Korea used subcontractors to duplicate and distribute both retail and white box products.

The CFC agreements with Microsoft Taiwan, Microsoft Korea, and Microsoft Japan imposed a mandatory trademark branding requirement on the CFC's.  The CFC agreements with Microsoft Ireland included an express trademark license.

Petitioner generally sent the master diskettes to the CFC's containing object code for the licensed retail products.  Similar to the OEM agreements, the CFC agreements imposed obligations on the CFC's to maintain in confidence all trade secret information petitioner provided.

Pursuant to the CFC agreements, petitioner ultimately received royalties from the CFC's.  MS-FSC reported the royalties on its returns as FTGRs from transactions in qualifying export property. The royalties in dispute are those received from Microsoft Japan, Microsoft Korea, Microsoft Ireland, and Microsoft Taiwan in 1990 and 1991, paid  pursuant to the CFC agreements.  During the years in issue, Microsoft Ireland accounted for approximately 85 percent of petitioner's royalty accruals from the CFC's.

Petitioner did not allocate or apportion the royalty stream from the CFC's and OEM's among intellectual property rights. Respondent determined that the royalties petitioner accrued from its export licensing transactions were not FTGR's on the basis that the

royalty income did not arise from transactions in export property (i.e., the income arose from disqualified intangibles).

OPINION

A. The Statutes

In 1971, Congress enacted the domestic international sales corporation (DISC) provisions (sections 991 through 997), see Revenue Act of 1971, Pub. L. 92-178, sec. 501, 85 Stat. 497, 535, to provide an export tax incentive to U.S. businesses and to improve the country's balance of payments, see S. Rept. 92-437, at 90 (1971), 1972-1 C.B. 559, 609. The DISC provisions attempted to equalize tax treatment between U.S. companies that sold goods in foreign markets regardless of whether the goods were made in the United States. These provisions allowed domestic corporations to defer taxes on a substantial portion of profits from export sales (similar to the tax benefits available to corporations manufacturing abroad through foreign subsidiaries). See H. Rept. 92-533, at 58 (1971), 1972-1 C.B. 498, 529; S. Rept. 92-437, supra at 90, 1972-1 C.B. at 609.

In 1984, Congress supplemented the DISC provisions with the foreign sales corporation (FSC) provisions (sections 921 through 927), see Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 801, 98 Stat. 494, 985, in order to comply with the General Agreement on Tariffs and Trade, see S. Prt. 98-169 (Vol. I), at 635 (Comm. Print 1984). Under the FSC provisions, a taxpayer may permanently exclude

from Federal income tax a portion of its profits from qualifying export sales.[3]

Both the DISC and the FSC provisions reallocate a portion of a U.S. company's profits attributable to its export of American-made products. The proper amount of the reallocation for 1990 and 1991 is in controversy.

Only activities that generate FTGR's qualify for FSC benefits. FTGR's are the gross receipts of an FSC that are:

(1) from the sale, exchange, or other disposition of export property,

(2) from the lease or rental of export property for use by the lessee outside the United States,

(3) for services which are related and subsidiary to--

---

[3] On Feb. 24, 2000, the World Trade Organization (WTO) appellate body upheld an October 1999 WTO panel ruling that the U.S. foreign sales corporation (FSC) tax regime is essentially an export subsidy in contravention of WTO rules. The panel recommended that the United States comply with the WTO ruling by Oct. 1, 2000, or face the prospect of European Union retaliation.

In May 2000, the United States proposed to the European Union an FSC replacement system, with tax benefits generally applying to foreign income from all foreign sales, rentals, and leases, regardless of whether goods are manufactured in the United States or abroad. The European Union rejected this proposal, maintaining that the system would continue to make tax benefits contingent upon exports.

As of the release date of this Opinion, H.R. 4986, 106th Cong., 2d Sess. (2000), the FSC Repeal and Extraterritorial Income Exclusion Act of 2000, is under consideration in order to bring the U.S. export tax regime into conformity with the WTO ruling.

(A) any sale, exchange, or other disposition of export property by such corporation, or

(B) any lease or rental of export property described in paragraph (2) by such corporation,

(4) for engineering or architectural services for construction projects located (or proposed for location) outside the United States, or

(5) for the performance of managerial services for an unrelated FSC or DISC in furtherance of the production of foreign trading gross receipts described in paragraph (1), (2), or (3).

Sec. 924(a).

The FSC and DISC provisions define "export property" as property "manufactured, produced, grown, or extracted in the United States".[4]   Secs. 927(a)(1)(A), 993(c)(1)(A).   However, export property does not include:

> patents, inventions, models, designs, formulas, or processes, whether or not patented, copyrights (other than films, tapes, records, or similar reproductions, for commercial or home use), good will, trademarks, trade brands, franchises, or other like property.

Secs. 927(a)(2)(B), 993(c)(2)(B). These sections expressly exclude intangible property from the definition of export property. The parenthetical phrase "other than films, tapes, records, or similar reproductions, for commercial or home use" (the parenthetical)

---

[4]   The parties have stipulated that for purposes of this case, petitioner's software development in the United States satisfied the manufacture or production requirement of sec. 927(a)(1)(A).

limits the unfavorable treatment with regard to copyrights.[5]

B. The Regulations

Section 1.993-3(f)(3), Income Tax Regs., T.D. 7514, 1977-2 C.B. 266, was issued on October 14, 1977,[6] excluding copyrights in books from export property treatment. Section 1.993-3(f)(3), Income Tax Regs., provides:

> (3) Intangible property. Export property does not include any patent, invention, model, design, formula, or process, whether or not patented, or any copyright (other than films, tapes, records, or similar reproductions, for commercial or home use), goodwill, trademark, tradebrand, franchise, or other like property. Although a copyright such as a copyright on a book does not constitute export property, a

---

[5] The Taxpayer Relief Act of 1997, Pub. L. 105-34, sec. 1171, 111 Stat. 788, 987, amended sec. 927(a)(2)(B). As a result, copyrights of computer software are explicitly referred to as not being excluded property (i.e., such copyrights qualify as export property). The amendment applies to gross receipts from computer software licenses attributable to periods after 1997, in tax years ending after Dec. 31, 1997.

The conference report accompanying the Taxpayer Relief Act of 1997 states that no inference is intended as to the qualification of computer software licensed for reproduction abroad as export property under the pre-1997 law. See H. Conf. Rept. 105-220, at 636 (1997), 1997-4 C.B. (Vol. 2) 1457, 2106. In reaching our conclusions, we have adhered to this pronouncement.

[6] On Oct. 12, 1977 (2 days before sec. 1.993-3(f)(3), Income Tax Regs., was issued), the Acting Commissioner of the Internal Revenue Service sent a memorandum to the Assistant Secretary of the Treasury recommending approval of sec. 1.993-3(f)(3), Income Tax Regs., and attached a technical memorandum in support thereof. The technical memorandum recognized that: (1) The parenthetical described a limited category of copyright rights; and (2) sound recording copyrights fell within the limited category of copyrights saved by the parenthetical.

copyrighted article (such as a book) if not accompanied by a right to reproduce it is export property if the requirements of this section are otherwise satisfied. However, a license of a master recording tape for reproduction outside the United States is not disqualified under this subparagraph from being export property.

Section 1.993-3(f)(3), Income Tax Regs., does not explicitly refer to computer software. Consequently, the Commissioner's position with respect to whether computer software qualifies as export property for DISC purposes was later expressed through the following pronouncements: (1) Gen. Couns. Mem. (GCM) 39,449 (Feb. 17, 1983), concluded that mass-marketed software without reproduction rights may qualify as export property under the DISC rules as being akin to a copyrighted book; (2) Tech. Adv. Mem. (TAM) 85-49-003 (Aug. 16, 1985), concluded that standardized, mass-marketed computer software without reproduction rights is section 993(c) export property; and (3) Priv. Ltr. Rul. (PLR) 86-52-001 (Sept. 3, 1986), concluded that exported computer software updates that were not copyrighted would qualify for DISC benefits because the property was sold without reproduction rights. (We recognize that GCM's, TAM's, and PLR's do not have the force of law and are not binding on us. We mention these pronouncements merely to show the manner in which the Commissioner interpreted and/or applied the regulations.)

On March 3, 1987, the Secretary promulgated section 1.927(a)-1T(f)(3), Temporary Income Tax Regs., 52 Fed. Reg. 6463 (Mar. 3, 1987) (the temporary regulation), effective for taxable years beginning after December 31, 1984.  The preamble to the temporary regulation states, in relevant part:

> Section 1.927(a)-1T provides definitions of export property for purposes of the FSC rules.  These definitions parallel in all important respects the definitions of export property of a DISC at §1.993-3.  These regulations at §1.927(a)-1T(f)(3) provide that export property will include certain standardized computer software on media that are mass-marketed <u>without the right to reproduce for external use</u>. * * * [Emphasis added.]

52 Fed. Reg. 6433.

The temporary regulation provides:

> (3) Intangible property.  Export property does not include any patent, invention, model, design, formula, or process, whether or not patented, or any copyright (other than films, tapes, records, or similar reproductions, for commercial or home use), goodwill, trademark, tradebrand, franchise, or other like property.  Although a copyright such as copyright on a book <u>or computer software</u> does not constitute export property, a copyrighted article (such as a book <u>or standardized, mass marketed computer software</u>) if not accompanied by a right to reproduce <u>for external use</u> is export property if the requirements of this section are otherwise satisfied.  <u>Computer software referred to in the preceding sentence may be on any medium, including, but not limited to, magnetic tape, punched cards, disks, semi-conductor chips and circuit boards</u>.  A license of a master recording tape for reproduction outside the United States is not disqualified

under this paragraph from being export property.

(The emphasized portions reflect additions or changes from the language of section 1.993-3(f)(3), Income Tax Regs.)

Following the promulgation of the temporary regulation, the Commissioner issued the following: (1) PLR 92-100-15 (Mar. 6, 1992) concluded that even though the software therein was not subject to a copyright, the license agreement restricted its use and reproduction, qualifying it as export property; (2) PLR 93-440-02 (May 27, 1993) concluded that a master computer disk provided to distributors, accompanied by a right to reproduce, is not export property; also, "tapes" in the parenthetical refers to audio or video tapes used in the entertainment industry and does not apply to magnetic tapes used in the computer software industry; and (3) TAM 93-44-002 (May 27, 1993) concluded that "computer software conveyed through a licensing agreement that gives the licensee the right to reproduce the software is excluded from the term 'export property'". Also, the technical advice memorandum reflected that the temporary regulation limited the reproduction exclusion of section 927(a)(2)(B) to reproductions used solely in the entertainment industry, stating, in relevant part:

> The parenthetical exception in section 927(a)(2)(B) of the Code and section 1.927(a)-1T(f)(3) of the regulations, which is identical to and based on the parenthetical exception in section 993(c)(2)(B) should also be interpreted to include only audio or video tapes used in the entertainment industry and not magnetic computer software tapes.

C.  Industry Position

Before enacting the FSC regime, the Senate Finance Committee received written submissions and held hearings on February 3, 1984. See Hearings on S. 1804 Before the Senate Comm. on Finance, 98th Cong., 2d Sess., Part 2 of 2 (1984).  Representatives from the software industry testified that the DISC provisions were unclear as to the treatment of exported computer software copyrights.  In this regard, Gerald K. Howard, vice president for taxes, Sperry Corp. (representing several computer, business, and electronics associations), stated:

> we ask that a DISC rule that has caused us some difficulty in the past be modified or clarified, namely that * * * the definition of qualified export property be revised to include software.  We believe that this will assist in eliminating the uncertainty that exists in the tax law concerning software. * * *
>
> We don't believe it was intended for the high technology industry to suffer a decrease in the tax incentives that are provided and we ask that software be included in the definition of export property. * * * [Emphasis added.]

Id. at 123.  The software industry's request went unheeded.

In 1993, software industry representatives again attempted to convince Congress to amend the FSC rules to "clarify" that exports of software qualify for FSC benefits that are available to other exports.  Legislation to make such "clarification" was introduced. Hearings on H.R. 63 Before Subcomm. on Select Revenue Measures, House Ways and Means Comm., 103d Cong.,  1st  Sess.,  Part  1 of 3

(1993). A software industry representative summarized the industry's position as follows:

> The failure to permit exports of computer software to qualify for FSC treatment is counterproductive and inconsistent with the U.S. interest in fostering the continued growth of this industry in the United States. In addition, there is no tax policy reason for denying exporters of software the tax benefits of the FSC rules that are available to other U.S. exporters and in particular the film and record industries * * *. There is a need for Congress to clarify the original intent of the DISC and FSC legislation to encourage U.S. exports, including software, in light of the Treasury Department's temporary FSC regulations. Therefore, we respectfully request that Congress enact legislation which would clarify that the definition of FSC export property includes the license of computer software to foreign distributors and customers with the right to reproduce.

Id. at 644 (statement by James A. Abrahamson, chairman of the board, Oracle Corp., on behalf of the FSC software coalition). In addition, the representative complained that the temporary regulation "adopted a narrow interpretation of the parenthetical exception and denied any FSC benefits for the license of computer software if the license is accompanied by the right to reproduce the computer software." Id. at 643. These hearings did not result in a change to section 927(a)(2)(B).

Over the next several years, over 100 members of Congress requested that the Department of the Treasury amend the temporary regulation to explicitly extend FSC benefits to the export of computer software licenses that include reproduction rights abroad.

See 141 Cong. Rec. S16,086-S16,087 (daily ed. Oct. 27, 1995) (statement of Sen. Hatch); 140 Cong. Rec. H3428 (daily ed. May 17, 1994) (statement of Rep. Lantos). The Department of the Treasury maintained that an "expansion" of the scope of the FSC rules required legislative action. 140 Cong. Rec. H3428 (daily ed. May 17, 1994) (letter from Secretary of the Treasury Bentsen to Rep. Lantos (May 6, 1994)). Legislation was introduced to expressly include the sale or licensing of computer software for use outside the United States, even when accompanied by a right to reproduce, within the definition of FSC export property. See 141 Cong. Rec. S16,086-S16,087 (daily ed. Oct. 27, 1995). This legislation was not enacted; thus, section 927(a)(2)(B) remained intact.

## D. The Parties' Positions

The threshold question before us is whether copyrights in computer software fall within the parenthetical. According to respondent:

> The parenthetical describes the narrow subset of copyright rights that Congress intended to "save" from the general rule excluding intangibles from export property. The parenthetical describes only copyright rights in motion pictures and sound recordings. The parenthetical was not intended to, and does not, refer to copyrights fixed on various media without regard to the nature of the copyrighted content.

Thus, respondent maintains that "the parenthetical refers to particular kinds of content fixed on the media that are mentioned in the parenthetical, and any similar media that might be invented in

the future." Reading the statute in a restrictive manner, respondent reasons that "The phrase 'similar reproductions' means similar content on other media, not simply any content on similar media." Respondent maintains that regardless of the medium upon which it is fixed, computer software is neither a motion picture nor a sound recording. According to respondent, a computer's functionality distinguishes computer software from motion pictures and sound recordings.

On the other hand, petitioner maintains that computer software masters are the same as or similar to motion pictures and sound recording masters. Thus, petitioner asserts that the software masters are "similar reproductions" to motion pictures and sound recordings.

Specifically, petitioner claims:

> "films, tapes, records" as used in section 927(a)(2)(B) denote tangible media on which images, sounds, and/or other information is recorded and stored. These media differ in terms of their specific physical attributes (e.g., a strip of photosensitive cellulose acetate, a plastic strip coated with magnetic powder, a spiral grooved disc). All three types of media, however, require a machine to read back the recorded content to the consumer or end user. In other words, they are inherently and necessarily machine-readable media.

Continuing, petitioner posits that the phrase "similar reproductions" (within the purview of the parenthetical) refers to

copyrighted work distributed on machine-readable media, existing or emergent, in addition to "films, tapes, and records".

To restate the parties' positions: in concluding that copyrights in computer software do not constitute export property, respondent asserts that "films, tapes, and records" are content-specific and that "similar reproductions" refers to "films, tapes, and records" on media that might be invented in the future. Conversely, in concluding that copyrights in computer software constitute export property, petitioner asserts that "films, tapes, and records" are media-specific, denoting the tangible media upon which images, sounds, and/or other information is recorded and stored, and that "similar reproductions" means any information that can be recorded on a recording medium (such as reel-to-reel films, Betamax or VHS videocassettes, DVD's, vinyl records, reel-to-reel tapes, 8-track tapes, cassette tapes, diskettes, hard disk drives, and CD's).

E.  Analysis

1.  Statutes

As a general rule, patents, inventions, copyrights, and other intangibles are not granted export property treatment for purposes of FSC benefits; rather, they are "excluded property". Sec. 927(a)(2)(B). We believe the exception (contained in the parenthetical) to this general rule should be narrowly interpreted.

In our opinion, the parenthetical refers to specific kinds of content, not any content placed on machine-readable media, as petitioner maintains.  When section 993(c)(2)(B) was enacted in 1971, no one could foresee the future media on which films and sound recordings might be distributed.  Because of this unknown, Congress included the phrase "similar reproductions" in the parenthetical.

"Reproduction" is an exact copy of particular preexisting content fixed on a medium. Blank tapes are not reproductions of each other (but are manufactured).  Copyright concerns content, not media.  Indeed, a copyright is defined as "A property right in an original work of authorship (such as a literary, musical, artistic, photographic, or film work) fixed in any tangible medium of expression, giving the holder the exclusive right to reproduce, adapt, distribute, perform, and display the work."  Black's Law Dictionary 337 (7th ed. 1999); see 17 U.S.C. sec. 102(a) (1988).  Clearly, petitioner does more than distribute blank tapes; petitioner's products are sold because of the content on the medium.

Were we to accept petitioner's broad interpretation that "similar reproductions" covers all content on machine-readable media, then revenues from the sale or lease of copyrights in practically all products (existing and yet to be invented) would qualify for FSC benefits.

The only copyrights Congress affirmatively identified as qualifying for export property treatment were copyrights in motion

pictures and sound recordings when it enacted section 993(c)(2)(B) (relating to DISCs) in 1971 and section 927(a)(2)(B) (relating to FSC's) in 1984. The parenthetical in both sections does not explicitly refer to computer software masters.

Computer software causes a computer to perform countless functions. Operating systems software makes a general-purpose computer function by controlling (1) the operation of the computer's hardware components, (2) the execution of applications, (3) the sequencing of tasks, and (4) the flow of information within the computer system. When combined with data and the hardware components of a computer system, computer software enables a computer to enter, store, process, and display information, thereby performing specific tasks. Without software, computers cannot function. To illustrate, if an audio CD is placed in the CD drive of a personal computer, it can be played only if a computer program has been loaded into the computer that instructs the computer how to play the CD. An audio CD does not make the computer function; the computer software does. Removal of the audio CD does not remove the ability of the computer to play a different audio CD. Yet if the software is not installed, the audio CD cannot be played.

Unlike software, motion pictures and sound recordings do not cause a computer to function. They are played on machines designed to play them (but do not cause the machine to function).

The mere fact that sound or video recordings can be digitally represented does not transform them into computer software.

Computer software is fundamentally different from motion pictures and sound recordings.  Within the purview of the parenthetical, (1) "films, tapes, and records" are content specific, and (2) "similar reproductions" refers to "films, tapes, and records" on media that might be invented in the future.  In sum, we hold that copyrights in computer software do not constitute section 927(a) "export property".  Support for this holding is found in the temporary regulation to which we now turn our attention.

2.  Interpretation of the Temporary Regulation

Generally, temporary regulations have binding effect and are entitled to the same weight as final regulations.  See UnionBanCal Corp. v. Commissioner, 113 T.C. 309, 316 (1999); Peterson Marital Trust v. Commissioner, 102 T.C. 790, 797 (1994), affd. 78 F.3d 795 (2d Cir. 1996).  We interpret temporary regulations in toto rather than phrase by phrase.  See Norfolk Energy, Inc. v. Hodel, 898 F.2d 1435, 1442 (9th Cir. 1990).

The temporary regulation comports with the language of the statute.  It succinctly states that, although copyrights do not constitute export property, copyrighted articles, such as computer software, do qualify as long as the article is not accompanied by a right to reproduce outside the United States.  Permitting a right

to reproduce abroad would facilitate reproduction activity outside the United States.  That is not the result intended.

The temporary regulation contains four sentences.  The first sentence is virtually identical to the language of the statute.  It states that intangibles (other than certain copyrights) are not export property.

The introductory clause of the second sentence applies the general rule that a copyright is not export property, giving books and computer software as examples of items subject to the general rule (disqualifying intangibles).  The second sentence states that a copyrighted article exported without the right to reproduce for external use is export property (so long as the other requirements are met).

The third sentence expands upon the second sentence.  Read together, the two sentences provide that computer software on any medium (i.e., magnetic tape, punched cards, or disks), if not accompanied by a right to reproduce outside the United States, is export property.  By rendering the medium irrelevant, the third sentence distinguishes among copyrights based upon their content.

The fourth sentence is identical to the last sentence of section 1.993-3(f)(3), Income Tax Regs.  It was therein inserted to address the concern of the sound recording industry that the parenthetical was not written broadly enough to include its industry practices.  Specific reference to computer software in the second

and third sentences of the temporary regulation would not have been made (in 1987) to contradict the fourth sentence (which was carried over from section 1.993-3(f)(3), Income Tax Regs., to the temporary regulation).

According to petitioner, computer software masters are "master recording tapes" (within the purview of the fourth sentence) licensed for reproduction outside the United States, and thus constitute export property. We disagree. Read in context, a "master recording tape" does not include computer software.

Because the second sentence interprets the general rule (that copyrights are not export property), "reproduction" in the fourth sentence refers to a copyright transaction described in the second sentence. The fourth sentence emphasizes that sound recording masters fall within the parenthetical and thus are not disqualified by the second sentence. Contrary to petitioner's assertion, the fourth sentence is not "trumped" by the second sentence because the fourth sentence concerns a "master recording tape" whereas the second sentence concerns computer software and books. (It was unnecessary to refer to motion pictures in the fourth sentence because the legislative history reflects that copyrights in motion pictures fall within the exception, and the motion picture industry did not lobby for modification.) Petitioner's interpretation of the fourth sentence would nullify, rather than harmonize with, other provisions of the temporary regulation.

In sum, we hold that pursuant to the temporary regulation, copyrighted computer software with a right to reproduce abroad does not qualify as export property.

### 3.  Validity of the Temporary Regulation

We now turn our attention to petitioner's alternative argument that the temporary regulation is invalid.

The temporary regulation was promulgated pursuant to the general authority granted to the Secretary by section 7805(a), not pursuant to specific legislative authority.  Thus, it is interpretive, see Jackson Family Found. v. Commissioner, 97 T.C. 534 (1991), affd. 15 F.3d 917 (9th Cir. 1994), and should be upheld if it is found to "'implement the congressional mandate in some reasonable manner'", United States v. Cartwright, 411 U.S. 546, 550 (1973) (quoting United States v. Correll, 389 U.S. 299, 307 (1967)). We defer to a regulation if it is a reasonable and permissible interpretation of the statute.  See, e.g., Atlantic Mut. Ins. Co. v. Commissioner, 523 U.S. 382, 389 (1998); National Muffler Dealers Association, Inc. v. United States, 440 U.S. 472, 488-489 (1979).

It is not our function to decide what the best or most advisable method would be to implement the Internal Revenue Code. As the Supreme Court stated in United States v. Correll, supra at 307: "Congress has delegated to the Commissioner, not to the courts, the task of prescribing 'all needful rules and regulations for the

enforcement' of the Internal Revenue Code." The delegation helps guarantee that the rules will be written by "masters of the subject." United States v. Moore, 95 U.S. 760, 763 (1877).

In determining whether the Secretary's interpretation of a statute is a reasonable one, rather than the best or only one, see Atlantic Mut. Ins. Co. v. Commissioner, supra, we are not at liberty to strike down the regulation even if the taxpayer offers a more attractive statutory interpretation, see United States v. Vogel Fertilizer Co., 455 U.S. 16, 26 (1982); Brown v. United States, 890 F.2d 1329, 1338 (5th Cir. 1989).

The parties agree that the standard in National Muffler Dealers Association, Inc. v. United States, supra at 477,[7] is appropriate in

---

[7]     National Muffler Dealers Association, Inc. v. United States, 440 U.S. 472, 477 (1979), states, in pertinent part:

> In determining whether a particular regulation carries out the congressional mandate in a proper manner, we look to see whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose. A regulation may have particular force if it is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent. If the regulation dates from a later period, the manner in which it evolved merits inquiry. Other relevant considerations are the length of time the regulation has been in effect, the reliance placed on it, the consistency of the Commissioner's interpretation, and the degree of scrutiny Congress has devoted to the regulation during subsequent re-enactments of the statute. [Citations omitted.]

this case.  By applying that standard, we hold that the temporary regulation is valid.  Our holding is based upon the following.

(1)  The temporary regulation harmonizes[8] with the purpose of the statute by specifically excluding intangibles from the definition of export property.  The purpose of the DISC/FSC provisions was to increase U.S. exports and U.S. jobs by excluding from Federal income tax certain property sold by an FSC or a DISC that was produced, manufactured, or created in the United States. See Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1976, at 290-291 (J. Comm. Print 1976).  The temporary regulation allows computer software to be entitled to this exclusion, as long as the software is not accompanied by a right to reproduce abroad.

On the other hand, exporting a computer software master with a right to reproduce abroad sends adaptation, localization, and manufacturing jobs offshore.  Thus, granting FSC benefits to copyrighted computer software with the right to reproduce abroad would undermine the basic policy of withholding tax incentives from export transactions that create manufacturing or production jobs overseas.

---

[8]  Petitioner acknowledges that, in the event we hold that the parenthetical is restricted to motion pictures and sound recordings (as we have), respondent's construction of the temporary regulation harmonizes with the statute's plain meaning.

Petitioner claims that because computer software involves a creative industry where important jobs are performed in the United States, it belongs in the parenthetical. Respondent posits that the question is not whether jobs are being performed in the United States but rather whether jobs that also could be performed in the United States are moved offshore because copyrights and other intangibles are exported under license. We agree with respondent.

(2) The temporary regulation reflects Congress' decision not to expand export property treatment for intangibles beyond copyrights in motion pictures and sound recordings. The 1976 and 1982 amendments to the DISC provisions reflected Congress' continuing concern with the cost and revenue effects of the DISC regime. Despite pleas from the representatives of the software industry for a change in the statutory language to include computer software as export property, section 993(c)(2)(B) was reenacted[9] as section 927(a)(2)(B) without the requested inclusion, apparently on the basis that the requested change would not be revenue neutral and that U.S. jobs would be moved offshore. See TSR, Inc. & Sub. v. Commissioner, 96 T.C. 903, 916-917 (1991). Had Congress desired to make FSC benefits available to computer software copyrights in 1984,

---

[9] The 1984 FSC legislation replaced many of the tax rules that had been applicable to DISCs. DISCs were not abolished; however, their tax benefits were limited, and an interest charge on tax-deferred amounts was imposed on DISC shareholders. See Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 802(b), 98 Stat. 494, 997.

it would have specifically done so.  See, e.g., <u>Central Bank v. First Interstate Bank</u>, 511 U.S. 164, 184-188 (1994); <u>United States v. Riverside Bayview Homes, Inc.</u>, 474 U.S. 121, 137 (1985). Congress' inaction reflects its intent not to grant export property treatment to computer software copyrights.  The temporary regulation followed Congress' lead.

(3)  Congress was aware of the temporary regulation, its treatment of computer software, and the debate thereon.  Congress had the opportunity to amend the statute in light of the temporary regulation.  See <u>Perkin-Elmer Corp. & Subs. v. Commissioner</u>, 103 T.C. 464, 480 (1994).  But it did not do so, and the inference of congressional approval is strong when legislative history contains some indication that Congress was aware of and approved the administrative construction.  See <u>Central Bank v. First Interstate Bank</u>, <u>supra</u> at 184-188.

(4)  The Commissioner has consistently denied export property treatment for computer software when accompanied by the right to reproduce outside the United States.  As early as the comment period leading up to the issuance of section 1.993-3(f)(3), Income Tax Regs., and the accompanying technical memorandum, see <u>supra</u> note 6, software industry representatives sought a regulation that would include computer software in the parenthetical.  The Commissioner considered but rejected the industry's position, as evidenced by the omission of computer software from section 1.993-3(f)(3), Income Tax

Regs.  The Commissioner again rejected the industry's position in the temporary regulation by explicitly excluding computer software.

(5)  Invalidating the temporary regulation would eradicate the need for "copyrights" to appear in section 927(a)(2)(B) because most copyrights would qualify.  If the parenthetical were to be expanded so as to be based upon the type of medium on which a copyrighted work can be mastered, then copyrights in books would qualify.

In sum, the temporary regulation represents a "reasonable accommodation of the competing interests of fairness, administrability, and avoidance of abuse."  Atlantic Mut. Ins. Co. Commissioner, 523 U.S. at 383.  We believe that the temporary regulation is a reasonable and permissible interpretation of section 927(a) and harmonizes with the language, purpose, and legislative history of the statute.

4.  Final Matters

In reaching our conclusions, we have considered all arguments raised by the parties.  For the sake of completeness, we now discuss two arguments that heretofore have not been addressed.

(1)  The parties disagree as to whether the royalties at issue were paid solely for the exploitation of copyright rights, as petitioner maintains, or for patents, trademark, and trade secrets, in addition to copyrights rights, as respondent maintains. Petitioner argues that assuming arguendo the royalties it received

from the OEM's and CFC's were for various types of intellectual property, the payment for rights other than copyrights was de minimis.

In light of our holding above that computer software masters do not fall within the parenthetical, we conclude that it is not necessary to decide this issue.

(2) Petitioner maintains that we should interpret the parenthetical in the same manner as the Court of Appeals for the Ninth Circuit (the court to which an appeal in this case would lie) interpreted the phrase "books, magazines, periodicals, films, video tapes, or other matter" for purposes of 18 U.S.C. sec. 2252(a)(4)(B) in United States v. Lacy, 119 F.3d 742 (9th Cir. 1997). In that case, the Court of Appeals interpreted "other matter" as follows:

> "matter" is the physical medium that contains the visual depiction--in this case, the hard drive of Lacy's computer and the disks found in his apartment. * * * "* * * a word is understood by the associated words, * * * a general term following more specific terms means that the things embraced in the general term are the same kind as those denoted by the specific terms." * * * Here, the word "matter" appears at the end of the list "books, magazines, periodicals, films, [and] video tapes," all of which are physical media capable of containing images. [Citations omitted.]

Id. at 748.

Lacy was a criminal case. The issue involved therein was whether an individual computer graphics file is "other matter" pursuant to 18 U.S.C. sec. 2252(a)(4)(B). The defendant was charged with possessing child pornography; he had downloaded computerized

visual depictions of child pornography to his computer. The statute in question made it a crime to possess "3 or more books, magazines, periodicals, films, video tapes, or other matter" containing the offending depictions. 18 U.S.C. 2252(a)(4)(B). The Court of Appeals held that because "matter" appeared at the end of a list of physical media capable of containing images, "other matter" containing any visual depiction of a minor engaging in sexually explicit conduct means a physical medium that contains visual depiction. United States v. Lacy, supra at 748; accord United States v. McKelvey, 203 F.3d 66 (1st Cir. 2000); see also United States v. Daury, 215 F.3d 257 (2d Cir. 2000); cf. United States v. Vig, 167 F.3d 443, 448 (8th Cir. 1999); United States v. Hall, 142 F.3d 988, 999 (7th Cir. 1998).

Petitioner's reliance on Lacy is misplaced. Lacy construed different words, within a different statute, in a different context. It is irrelevant to the issue before us.

5. Conclusion

Computer software does not come within the purview of the parenthetical. Accordingly, we hold that copyrights in computer software masters are not export property for purposes of determining section 924 FTGR's.

To reflect the foregoing and the parties' concessions,

<u>Decision will be entered</u>

<u>under Rule 155</u>.