N.R. SMITH, Circuit Judge,
dissenting.
Because the. facts and law do not “clearly favor” issuing a preliminary injunction to Garcia, the district court did not abuse its discretion in denying Garcia’s requested relief. As a result, I must dissent.
I. Standard of Review
The majority opinion omits applying the requisite standard of review that is especially pertinent to Garcia’s requested relief. Mandatory preliminary injunctions, similar to the one issued today, are “particularly disfavored.” Stanley v. Univ. of S. Cal., 13 F.3d 1313, 1320 (9th Cir.1994).
Different from the usual “prohibitory injunction,” a “mandatory injunction goes well beyond simply maintaining the status quo pendente lite.” Id. (internal quotation marks omitted). As an example, requiring a university to reappoint a faculty member whose contract had expired constitutes a mandatory injunction. Id.; see also, e.g., Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873, 879 (9th Cir.2009) (“[T]he affirmative step of recalling [a] product” is also a mandatory injunction.). In the instant dispute, Garcia requests relief through a mandatory injunction. Rather than asking to maintain the status quo pending litigation, Garcia demands Google immediately remove a film from YouTube. Therefore, her request must be “subject to a higher degree of scrutiny because such relief is particularly disfavored under the law of this circuit.” Stanley, 13 F.3d at 1320. This higher degree of scrutiny requires courts to be “extremely cautious” and “deny such relief unless the facts and law clearly favor the moving party.” Id. at 1319-20 (internal quotation marks omitted, emphasis added). Indeed, mandatory injunctions “are not issued in doubtful cases.” Anderson v. United States, 612 F.2d 1112, 1115 (9th Cir.1979) (internal quotation marks omitted).
This standard’s importance must be appreciated in conjunction with the general standard with which this court reviews a district court’s decision to deny preliminary injunctive relief: “abuse of discretion.” Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir.2011). As a result, the majority may only reverse if it were illogical or implausible, United States v. Hinkson, 585 F.3d 1247, 1263-64 (9th Cir.2009), for the district court to *941 conclude that the law and facts did not dearly favor Garcia, Stanley, 13 F.3d at 1320.[1]
Given this standard, the majority errs in requiring Google to pull the film from YouTube — at this stage of the litigation. The district court did not abuse its discretion in concluding that the law and facts did not clearly favor Garcia. Instead, the majority makes new law in this circuit in order to reach the result it seeks. We have never held that an actress’s performance could be copyrightable. Indeed, “[tjhere is little case law or statutory authority as to the position of performers as authors of an audiovisual work under U.S. law.” F. Jay Dougherty, Not a Spike Lee Joint? Issues in the Authorship of Motion Pictures under U.S. Copyright Law, 49 UCLA L.Rev. 225, 300 (2001).
II. Application of the Winter Factors
“A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.” Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).
A. Garcia’s Likely Success on the Merits of Her Copyright Claim
The district court concluded that it was unclear whether Garcia had a copyright interest in her acting performance. The district court’s discretionary conclusion hardly appears illogical or implausible.
1. Copyright Interest
A protected interest under the Copyright Act must be an “original work[ ] of authorship fixed in any tangible medium of expression....” 17 U.S.C. § 102(a). Garcia does not clearly have a copyright interest in her acting performance, because (1) her acting performance is not a work, (2) she is not an author, and (3) her acting performance is too personal to be fixed.[2]
a. Work
To be protected, Garcia’s acting performance must be a “work.” Id. Congress has listed examples of copyrightable works, like architectural works, motion pictures, literary works, and pictorial or sculptural works. Id. The nature of these works is significantly different from an actress’s individual performance in a film, casting doubt on the conclusion that the latter can constitute a work. See Microsoft Corp. v. C.I.R., 311 F.3d 1178, 1184-85 (9th Cir.2002) (“The doctrine of noscitur a sociis counsels that words should be understood by the company they keep.”).
Section 101 of the Act is also instructive, because it differentiates a work from the performance of it. It defines “perform a ‘work’ ” to mean “to recite, render, play, dance or act it.” 17 U.S.C. § 101 (empha *942 sis added). Given this provision, it is difficult to understand how Congress intended to extend copyright protection to this acting performance. While Congress distinguishes the performance from the work itself, the majority blurs this line. Its position contemplates something very different from amalgamating independently copyrightable interests into a derivative work. See id. at § 103(b).
Consistent with section 101, section 102(b) outlines that which is not given copyright protection. It states: “In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.” Id. 74-3 F.3d 1258. at § 102(b). An acting performance resembles the “procedure” or “process” by which “an original work” is performed. Id. Therefore, “[i]n no case does copyright protection” extend to an acting performance, “regardless of the form in which it is described, illustrated, or embodied in” the original work. Id.
In sum, a motion picture is a work. Id. at § 102(a). A segment independently produced and then incorporated into a motion picture is also a work. See, e.g., Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 556 (9th Cir.1990). However, the Copyright Act does not clearly place an acting performance within its sphere of copyrightable works. As a result, the law and facts do not clearly favor finding a copyrightable interest in Garcia’s acting performance.
b. Authorship
Like the work requirement, the Copyright Act also premises copyright protection on authorship. 17 U.S.C. § 102(a). Authorship is also a constitutional copyright requirement. See U.S. Const. Art. I, § 8, cl. 8; Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 56, 4 S.Ct. 279, 28 L.Ed. 349 (1884). Aalmuhammed v. Lee is the most relevant case in this circuit on the question of authorship. 202 F.3d 1227 (9th Cir.2000). Though the Aalmu-hammed court discussed authorship in the context of joint authors of a film (which Garcia does not claim to be), it articulated general principles of authorship that assist in analyzing Garcia’s interest in her acting performance.[3]
The Aalmuhammed court explained that “[t]he word [author] is traditionally used to mean the originator or the person who causes something to come into being.” Id. at 1232. In other words, the author is the “person with creative control.” Id. Thus, “an author ‘superintends’ the work by exercising control.” Id. at 1234 (quoting Burrow-Giles, 111 U.S. at 61, 4 S.Ct. 279) (alteration omitted). Another framing by the court defined an author as “ ‘he to whom anything owes its origin.’ ” Id. at 1233 (quoting Burrow-Giles, 111 U.S. at 58, 4 S.Ct. 279). An author might also be “ ‘the inventive or master mind’ who ‘creates, or gives effect to the idea.’ ” Id. at 1234 (quoting Burrow-Giles, 111 U.S. at 61, 4 S.Ct. 279). Indeed, authorship “requires more than a minimal creative or original contribution to the work.” Id. at 1233 (citing Burrow-Giles, 111 U.S. at 58, 4 S.Ct. 279) (emphasis added).[4] These *943 principles comport with the “general rule,” that “the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection.” Commty. for Creative Non-Violence v. Reid, 490 U.S. 730, 737, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989).
In concluding that Aalmuhammed was not a joint author of the film, Malcolm X, the court found that he (1) “did not at any time have superintendence of the work,” (2) “was not the person “who ... actually formed the picture by putting the persons in position, and arranging the place,’ ” (3) could not “benefit” the work “in the slightest unless [the director] chose to accept [his recommendations],” and (4) made “valuable contributions to the movie,” but that alone was “not enough for co-authorship of a joint work.” Aalmuhammed, 202 F.3d at 1235.
Garcia’s contribution is less significant than Aalmuhammed’s. She conceded in her complaint and affidavit that she had no creative control over the script or her performance. Youssef provided the script, the equipment, and the direction. As a result, Garcia was not the originator of ideas or concepts. She simply acted out others’ ideas or script. Her brief appearance in the film, even if a valuable contribution to the film, does not make her an author. Indeed, it is difficult to understand how she can be considered an “inventive or master mind” of her performance under these facts.
The majority dismisses Aalmuhammed as inapposite, instead bolstering its conclusion with reference to acting manuals and treatises. See maj. op. at 934-35. In so doing, it goes too far in attempting to distinguish Aalmuhammed. First, the Aalmuhammed court articulated general principles of authorship that it pulled from the Supreme Court case, Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 4 S.Ct. 279, 28 L.Ed. 349 (1884). See, e.g., Aalmuhammed, 202 F.3d at 1233 (“Burrow-Giles is still good law....”). Burrow-Giles has nothing to do with joint works; instead, the Court interpreted “author” as featured in Article I, Section 8, Clause 8 of the U.S. Constitution. See 111 U.S. at 56, 4 S.Ct. 279. Second, the majority’s one quotation from Aalmuhammed, maj. op. at 935, is taken out of context. The very next line in that opinion makes clear that copyright protection is premised on authorship, whether the work is joint or otherwise:
We hold that authorship is required under the statutory definition of a joint work, and that authorship is not the same thing as making a valuable and copyrightable contribution. We recognize that a contributor of an expression may be deemed to be the “author” of that expression for purposes of determining whether it is independently copyrightable.
Aalmuhammed, 202 F.3d at 1232. Finally, Section 102(a) of the Copyright Act and Article I, Section 8, Clause 8 of the U.S. Constitution both premise copyright protection on authorship. Therefore, not only does the majority decline to apply the most relevant precedent in this circuit on the question before it, it also reads the authorship requirement out of the Copyright Act and the Constitution.[5]
Even the commentators agree that Aal-muhammed not only applies to Garcia’s claim, but also forecloses her realization of *944 a copyrightable interest in her acting performance. See, e.g., Dougherty, Not a Spike Lee Joint?, 49 UCLA L.Rev. at 306 (“Under the judicially enhanced joint work requirements,” an actress’s performance would be “physically inseparable from other cinematic contributions.” (citing Aalmu-hammed, 202 F.3d at 1232)); Lee, Entertainment and Intellectual Property Law § 12:7 (2013) (“Under [Aalmuhammed], ... individual contributors will rarely qualify as joint authors”).
The majority lauds an actress’s creative role in a film, maj. op. at 934, but the practical impact of its decision must not be ignored. Garcia’s role in the film is minimal. Yet the majority concludes that she somehow created a work Congress intended to protect under the Copyright Act. Considering the number of contributors who inject the same or a greater amount of creativity into a film, the majority’s omission of any inquiry into authorship indeed creates “an impenetrable thicket of copyright.” Maj. op. at 936. Meanwhile, though Aalmuhammed’s interpretation of the Copyright Act has been debated in academic circles, “it adopts a standard that promotes clarity in the motion picture industry.” Lee, Entertainment and Intellectual Property Law § 12:7.
Because Garcia does not qualify as an author under Aalmuhammed, the law and facts do not clearly favor protecting her acting performance under the Copyright Act.
c. Fixation
Lastly, the subject matter protected by the Copyright Act must also be “fixed in [a] tangible medium of expression....” 17 U.S.C. § 102(a). Copyright preemption cases are instructive on the question of fixation.
For preemption purposes, the courts generally agree that “the scope of the subject matter of copyright law is broader than the protection it affords.” Montz v. Pilgrim Films & Television, Inc., 649 F.3d 975, 979 (9th Cir.2011) (en banc); see U.S. ex rel. Berge v. Bd. of Trs. of Univ. of Ala., 104 F.3d 1453, 1463 (4th Cir.1997). In other words, the subject matter underlying a state law claim preempted by the Copyright Act may nevertheless not be protected by the Copyright Act. By implication, subject matter supporting a non-preempted state law claim is definitely not protected by the Copyright Act. A number of cases from this circuit discuss subject matter akin to an acting performance and prove useful on the question of fixation.[6]
In Midler v. Ford Motor Co., Bette Mi-dler sued Ford for misappropriating her voice in a commercial. 849 F.2d 460, 462 (9th Cir.1988). Although Ford properly had a license from the song’s copyright holder, it paid someone to imitate Midler in singing the song Midler made famous. Id. Although ultimately holding for Ford, the court rejected its argument that Mi-dler’s claim was preempted by copyright law. “A voice is not copyrightable. The sounds are not ‘fixed.’ What is put forward ... here is more personal than any work of authorship.” Id.; see also Sinatra v. Goodyear Tire & Rubber Co., 435 F.2d 711 (9th Cir.1970).
*945 In Laws v. Sony Music Entertainment, we distinguished Midler from its facts in holding that the plaintiffs claim was preempted by the Copyright Act, because “Sony was not imitating “Very Special’ as [the plaintiff] might have sung it. Rather, it used a portion of “Very Special’ as sung by [the plaintiff].” 448 F.3d 1134, 1141 (9th Cir.2006). Where Sony had a license to the entire song, its use of a portion of it under that license could not be attacked outside the copyright laws. Id.
Jules Jordan Video, Inc. v. 144942 Canada, Inc., 617 F.3d 1146 (9th Cir.2010), is like Laws. Defendants in Jules Jordan copied (without authorization) pornographic DVDs produced and copyrighted by Jules Jordan Video, then reproduced, counterfeited, and sold their copies to third parties. Id. at 1153. Because Jules Jordan held a copyright in the original DVDs, this court found that the Copyright Act preempted its state law right of publicity claim against Defendants.
The subject matter in Jules Jordan and Laws concerned entire copyrighted works — video and music recordings. Differently, Midler involved the imitation of a singer’s voice. Combined, these cases show that, just as the singing of a song is not copyrightable, while the entire song recording is copyrightable, the acting in a movie is not copyrightable, while the movie recording is copyrightable.[7]
A musical recording involves many moving parts, including the tune, lyrics, instrumental musicians, vocalists, and a production team that edits and prepares the final song. While the ultimate product is copyrightable, Ninth Circuit precedent dictates that a vocalist’s singing of the song is not copyrightable. See Midler, 849 F.2d at 462. An acting performance depends upon similar moving parts: a script, multiple actors’ and actresses’ performances, guidance from directors and staff, and editing and other production preparation. The movie is ultimately copyrightable. See 17 U.S.C. § 102(a). But one actress’s individual acting performance in the movie, like a vocalist singing a song, “is more personal than any work of authorship.” Midler, 849 F.2d at 462. As a result, it is not fixed. See id.
Just as “an actor does far more than speak words on a page,” maj. op. at 934, so too does a vocalist. Indeed, one might say that otherwise, “every schmuck” is a vocalist, “because everyone ... knows how to read.” Id. (quoting Sanford Meisner & Dennis Longwell, Sanford Meisner on Acting 178 (1987)) (quotation marks omitted). An actress like Garcia makes a creative contribution to a film much like a vocalist’s addition to a musical recording. Garcia did not write the script; she followed it. Garcia did not add words or thoughts to the film. She lent her voice to the words and her body to the scene. Her creativity came in the form of facial expression, body movement, and voice. Similarly, a singer’s voice is her personal mobilization of words and musical notes to a fluid sound. Inflection, intonation, pronunciation, and pitch are the vocalist’s creative contributions. Yet, this circuit has determined that such, though perhaps creative, is too personal to be fixed. See Midler, 849 F.2d at 462.
Under this line of cases, an actress’s performance in a film is more like the personal act of singing a song than the complete copyrighted works in Laws and Jules Jordan. As a result, it does not seem copyrightable. Thus, the law and *946 facts do not clearly support Garcia’s claim that her acting performance is protected under the Copyright Act.
Considering work, authorship, and fixation, Garcia has not demonstrated how the facts and law clearly favor her claim of a copyrightable interest in her acting performance.[8]
2. Work for Hire Doctrine
Even if the majority were correct in finding a copyrightable interest 'in Garcia’s acting performance, preliminary injunctive relief would be unwarranted. The district court did not address the application of the work for hire doctrine. Yet, the law and facts do not clearly show that Garcia was not working for hire.
“In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title.... ” 17 U.S.C. § 201(b). “A ‘work made for hire’ is a work prepared by an employee within the scope of his or her employment....” Id. at § 101. Therefore, “[i]n determining whether a hired party is an employee under the general common law of agency, we consider the hiring party’s right to control the manner and means by which the product is accomplished.” Reid, 490 U.S. at 751, 109 S.Ct. 2166.
Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party’s discretion over when and how long to work; the method of payment; the hired party’s role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.
Id. at 751-52, 109 S.Ct. 2166 (internal citations omitted). Though “[n]o one of these factors is determinative,” id. at 752, 109 S.Ct. 2166, the hiring party’s control “is the central inquiry here.” JustMed, Inc. v. Byce, 600 F.3d 1118, 1125 (9th Cir.2010).
The work for hire doctrine “is important in the analysis of motion picture authorship because in the United States most contributions to a motion picture are created as works made for hire.” Dougherty, Not a Spike Lee Joint?, 49 UCLA L.Rev. at 238. Here, Garcia conceded in her complaint and affidavit that Youssef “managed all aspects of production,” controlling both the manner and means of making the film, including the scenes featuring Garcia. Further, this “central” factor is not the only one supporting a work for hire finding here. The bulk of the other factors also suggest that Garcia is an employee. Yous-sef provided the instrumentalities and tools, dictated the filming location, decided when and how long Garcia worked, and was engaged in the business of film making at the time. Additionally, Garcia did not hire or pay assistants. Contrary to the majority’s conclusion, maj. op. at 12-14, the facts and law do not clearly favor *947 finding that Garcia was not working for hire.[9]
In Reid, the Court decided a sculptor was not an employee, even though Community for Creative Non-Violence “directed enough of Reid’s work to ensure that he produced a sculpture that met their specifications.” Reid, 490 U.S. at 752, 109 S.Ct. 2166. However, “all the other circumstances weighted] heavily against finding an employment relationship.” Id. This case differs considerably from Reid. The central factor of control and many other factors “weigh heavily” for finding an employment relationship.
In sum, the majority gives zero deference to the district court’s position on the likelihood for success factor. To justify its opinion, the majority must show the district court abused its discretion in determining the law and facts did not clearly show Garcia was likely to succeed on the merits. This, the majority has failed to do.
B. Irreparable Harm
The district court decided that because “[t]he Film was posted for public viewing on YouTube” five months prior to Garcia bringing suit, she “has not demonstrated that the requested preliminary relief would prevent any alleged harm.” The majority has failed to demonstrate how the district court abused its discretion in so holding.
Indeed, the district court’s application of the law to the facts of this case here was not an abuse of discretion. A “[p]laintiffs long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm.” Oakland Tribune, Inc. v. Chronicle Publ’g Co., 762 F.2d 1374, 1377 (9th Cir.1985). The district court gave significant weight to Garcia’s delay in filing suit, even given Garcia’s explanation for her delay. See maj. op. at 938. This is not illogical or implausible. Were Garcia really trying to protect her purported copyright interest in her acting performance, one would expect her to have brought this action immediately after learning of the alleged infringing behavior. Considering “[t]he relevant harm is the harm that ... occurs to the parties’ legal interests,” Garcia has failed to explain her delay in terms of harm to her alleged copyright interest. See Salinger v. Colting, 607 F.3d 68, 81 & n. 9 (2d Cir.2010) (“[T]he justification of the copyright law is the protection of the commercial interest of the artist/author. It is not to coddle artistic vanity or to protect secrecy, but to stimulate creation by protecting its rewards.” (internal quotation marks omitted)).
Further, by Garcia’s own admission, the film has been widely discussed and disseminated; Garcia admits in her affidavit that she “went public and advised the world through media that [she] did not condone the film.” Thus, while Garcia has provided undisputed evidence of past threats and injuries, she has failed to link her allegations of future harm to potential future viewings of the film on YouTube. See Perfect 10 v. Google, Inc., 653 F.3d 976, 982 (9th Cir.2011); Ctr. for Food Safety v. Vilsack, 636 F.3d 1166, 1173 (9th Cir.2011).
Therefore, it is not illogical or implausible to conclude that the law and facts do not clearly demonstrate how Garcia will suffer continued irreparable harm caused by the presence of the film on YouTube. See Small v. Operative Plasterers’ and Cement Masons’ Int'l Ass’n Local 200, 611 F.3d 483, 494 (9th Cir.2010).
*948 Rather than focusing on the logic or plausibility of the district court’s decision, the majority substitutes its own explanation of why Garcia’s delay should not be held against her. Maj. op. at 938-39. However, the weight attached by the district court to certain facts when measuring irreparable harm is not for this court to second guess. See Earth Island Inst. v. Carlton, 626 F.3d 462, 475 (9th Cir.2010).
C. Balancing the Equities
When considering the propriety of preliminary injunction relief, “a stronger showing of one element may offset a weaker showing of another.” Alliance for the Wild Rockies, 632 F.3d at 1131. The district court applied this concept in concluding preliminary injunctive relief was unwarranted without considering the balance of the equities or the public interest.
However, the balance of the equities does not clearly favor Garcia. A court must “balance the interests of all parties and weigh the damage to each.” Stormans, Inc. v. Selecky, 586 F.3d 1109, 1138 (9th Cir.2009).
Google argues that the balance of the equities does not clearly favor Garcia, because “[a] court order requiring removal from YouTube of the Film or any portion thereof would impose a substantial burden on free expression, without preventing any future harm to Appellant.” Garcia is only faced with potential infringement of her potential copyright interest pending a final disposition of this lawsuit. Further, she is not completely without fault in these circumstances. If she valued her acting performance to the extent she now claims, why didn’t she protect her performance by contract? The facts evidence that she acted for three days and was paid $500 dollars. Balancing the harm faced by both Garcia and Google, the law and facts do not clearly favor Garcia.
In its basis concerning the balance of the equities, the majority discusses Yous-sef s reproachable conduct. Maj. op. at 939. However, Youssef is not a party to this appeal, and Google was not a party to any of Youssef s actions.
Therefore, the balance of the equities does not clearly favor Garcia.
D. Public Interest
“In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.” Johnson v. Couturier, 572 F.3d 1067, 1082 (9th Cir.2009) (quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)) (emphasis added). In fact, “‘the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff.’ ” Stormans, 586 F.3d at 1139 (quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 312-313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)).
The public’s interest in a robust First Amendment cannot be questioned. See Sammartano v. First Judicial Dist. Court, 303 F.3d 959, 974 (9th Cir.2002). Opposite this vital public interest is Garcia’s allegation of copyright infringement. Properly enforcing the Copyright Act is also an important public interest. See Small v. Avanti Health Sys., LLC, 661 F.3d 1180, 1197 (9th Cir.2011). Indeed, if Google were actually infringing Garcia’s copyright, the First Amendment could not shelter it. See Eldred v. Ashcroft, 537 U.S. 186, 219-20, 123 S.Ct. 769, 154 L.Ed.2d 683 (2003).
But the case at bar does not present copyright infringement per se. Instead (in an unprecedented opinion), the majority concludes that Garcia may have a copy *949 right interest in her acting performance. Maj. op. at 935. As a result, Google’s contention, that issuing a preliminary injunction on these facts may constitute a prior restraint of speech under the First Amendment, identifies an important public interest.
Thus, the law and facts do not clearly demonstrate how granting a preliminary injunction in Garcia’s favor would serve the public interest.
III. Conclusion
The Stanley standard counseling extreme caution when considering granting a mandatory preliminary injunction is premised on principles of judicial restraint. Instead, the majority abandons restraint to procure an end (ordering the film be taken down) by unsuitable means (the Copyright Act).

. As this is the relevant standard of review, the district court’s application of it is hardly "equivocation.” See maj. op. at 933 n. 2. Furthermore, the amended portions of the majority opinion only confirm that the law and facts do not clearly favor Garcia: “Nothing we say today precludes the district court from concluding that Garcia doesn't have a copyrightable interest, or that Google prevails on any of its defenses.” Maj. op. at 935. Where the law and facts must clearly favor Garcia in order for her to prevail, the majority’s equivocation cements its error.

. The majority relies solely on a showing of originality to conclude Garcia has a copyrightable interest in her acting performance, maj. op. at 934 (citing Feist Publ’ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)), but the Constitution and the Copyright Act require much more.

. Furthermore, Garcia’s interest in her acting performance may best be analyzed as a joint work with Youssef, considering she relied on Youssef's script, equipment, and direction. See 17 U.S.C. § 101 ("A 'joint work’ is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.”).

. The majority opinion cannot coexist with this statement. See maj. op. at 934.

. The majority’s sole reliance on Feist Publications to conclude that an acting performance is copyrightable, maj. op. at 934-35, gives insufficient weight to the constitutional and statutory authorship requirement. In Feist Publications, the specific question was not of authorship but of originality. See 499 U.S. at 347, 111 S.Ct. 1282.

. The majority opinion dismisses the line of copyright preemption precedent. Maj. op. at 935 ("Midler isn’t a copyright case at all — it’s a right of publicity case that happens to discuss copyright in the context of preemption.”). However, these cases feature the same judges interpreting the same Copyright Act, whether the question is one of copyright infringement or copyright preemption. Thus, the majority’s distinction is without difference; it fails to overcome the fact that subject matter underlying a non-preempted state law claim, like that in Midler, is clearly without the Copyright Act’s protection. See Montz, 649 F.3d at 979.

. This is not the case where an independently authored clip is used in a film, as in Effects Assocs., 908 F.2d at 557-58. Rather, this analogy assumes facts similar to the instant case: an actress acting out a script she did not write under the direction of someone else who provides all of the instruments, tools, and leadership.

. The majority’s amended opinion also attempts to hedge its conclusion that Garcia has a copyright interest in her acting performance by avoiding counter arguments it failed to address, because they were not raised by the parties. Maj. op. at 935, 939. Yet, the majority could consider these arguments sua sponte "under exceptional circumstances, where substantial public interests are involved, or where to not do so would be unduly harsh to one or both of the parties.” United States v. Hoyt, 888 F.2d 1257, 1258 (9th Cir.1989). The majority’s failure to even engage this inquiry, instead quickly dismissing arguments against its view, confirms its error.

. While the majority may dispute which person was actually directing the film, it cannot overcome Garcia's own admissions in her complaint that substantiate these facts; she was not in control.